# ROBERTA GRAY v. STATE.

No. A-3531—Opinion Filed Feb. 22, 1921.

(195 Pac. 503.)

(Syllabus:)

1. **TRIAL—Weight of Evidence for Jury.** The weight and credibility to be given to evidence are matters exclusively within the province of the jury.

2. **HOMICIDE—Manslaughter in First Degree—Sufficiency of Evidence.** Evidence examined and held sufficient to sustain a conviction for manslaughter in the first degree.

*Appeal from District Court, Pittsburg County;*

*R. W. Higgins, Judge.*

Roberta Gray was convicted of the crime of manslaughter in the first degree, and she appeals. Affirmed.

*Sewell & Eylar* and *Cad Mathis,* for plaintiff in error.

*S. P. Freeling.* Atty. Gen., and *W. C. Hall,* Asst. Atty. Gen., for the State.

MATSON, J. Plaintiff in error, hereafter referred to as defendant, was on the 21st day of October, 1918, in the district court of Pittsburg county, convicted of the crime of manslaughter in the first degree, and sentenced to serve a term of four years' imprisonment in the state penitentiary.

An appeal was taken from the judgment, and it is sought to reverse the same on the sole ground that the evidence is insufficient to support the conviction.

Defendant killed her husband, Joe Gray, who was an engineer at one of the coal mines at Carbon, in Pittsburg

county, by shooting him with a 25-caliber automatic re-
volver. At the time of the homicide, which occurred
about 8:30 or 9 o'clock in the morning, Joe Gray was at
work in the engine room or boiler shed connected there-
with, and defendant, after arming herself with the re-
volver, went from their home to the place where her
husband was working. It appears from the evidence that
on the night before the homicide Joe Gray had not re-
turned home, but had spent that night at a residence not
far from his home, presumably in the company of a
woman other than his wife. Defendant claims to have
seen deceased leave this residence about 6 o'clock in the
morning, and says that she went down to the engine
house to find out why her husband had not returned to
his home the night before. After her arrival at the en-
gine house, defendant claims that a quarrel ensued be-
tween her husband and her, during the progress of which
her husband picked up a heavy piece of iron and struck
her, after which she shot him in her necessary self-de-
fense.

To the contrary, of defendant's testimony the evidence
is, on the part of apparently disinterested witnesses who
were close to the scene of the trouble, that two or three
shots were fired inside the engine house, after which de-
fendant was seen to run from the north door of the en-
gine house followed by deceased, who threw something
at her, after which deceased fell, and in a short time
died from the effects of a gunshot wound in his right
breast, which severed the aorta.

On cross-examination defendant testified in part as
follows:

"Q. What is this party's name? A. This woman?

"Q. Yes. A. Victoria Rignew.

"Q. I thought you said Lewis. A. No; Lewis is the woman in the house. Victoria is the woman that give me trouble.

"Q. Where does Victoria live? A. She lives at Danville, Ark.

"Q. Where does Mrs. Lewis live? A. She lived in Carbon.

"Q. Where? A. Right up from the boiler room.

"Q. How far? A. Well, I don't just know the distance. About thirty—I don't know exactly how far it is.

"Q. Did you see him come out of Mrs. Lewis'? A. Saw him come out that morning, out of the yard.

"Q. This same morning of the day that you killed him? A. Yes, sir.

"Q. Saw him come out of Mrs. Lewis'? A. Yes, sir.

"Q. At what time? A. About half past 6, as near as I can get at it. I was up at 5.

"Q. It made you awful mad, didn't it? A. I don't know that it made me so awful mad.

"Q. That is the reason you put that gun in your pocket, isn't it? A. No, sir.

"Q. You were mad and jealous because he had come out of Lewis'?

"Mr. Sewell: Objected to as incompetent, irrelevant and immaterial.

"The Court: The objection is overruled.

"A. No, sir; I wasn't mad or jealous. Of course,

I was jealous. I don't want my husband running after no woman.

"Q. Of course you didn't? A. Sure not.

"Q. And you took that gun down there. Did you have a full magazine? A. No; I only had three loads.

"Q. Shot them all? A. Yes, sir; all of them.

"Q. Now, you told your husband that you had seen him coming out of Mrs. Lewis'? A. Yes; I told him of it.

"Q. And he cursed you and told you it wasn't any of your business? A. Yes, sir.

"Q. And then you let down on him with the pistol? A. No, sir; I didn't let down on him with no pistol until he commenced following me."

The entire argument of counsel for defendant is directed against the weight of the evidence and its credibility—matters exclusively within the province of the jury. It is apparent from an examination of the record in this case that defendant armed herself with a deadly weapon, and sought out her husband at his place of business, in an angry frame of mind. That she was jealous of him and another woman is, admitted. The reasonable inferences are that this trouble was sought by defendant, and, if the killing was not premeditated on her part, it was certainly committed while in the heat of passion and under the influence of extreme jealousy.

The punishment imposed is the minimum under the law for manslaughter in the first degree. The fact that the deceased had been unfaithful to defendant and had violated his marital vows, no doubt prompted the jury in dealing so leniently with defendant.

Judgment affirmed.

DOYLE, P. J., and BESSEY, J., concur.