## CHARLES STEEN v. STATE.

No. A-7890.   Sept. 25, 1931.
Withdrawn, Corrected, Refiled, and Rehearing Denied Oct. 24, 1931.
(4 Pac. [2d] 122.)

Wells & Greer and White & White, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, P. J.   The plaintiff in error, hereinafter referred to as the defendant, was by information charged with the crime of murder, convicted of manslaughter in the first degree, and sentenced to the state penitentiary for a period of four years, and appeals.

The evidence of the state tends to show that the defendant, on the 15th day of April, 1929, at his home in the oil fields near Seminole, Okla., shot the deceased with a shotgun, from the effects of which wounds the deceased died.   The defendant admitted the shooting, but insisted that he shot the deceased in his own necessary self-defense.

There were two eyewitnesses to the killing. Ransom Heath testified for the state, in substance, as follows:

"I know the defendant Charles Steen; I know where his place was located on the 15th day of April, 1929; I was at his place twice that day, the first time in the afternoon, and the second occasion a little after 8 o'clock in the evening; I had seen Leonard Larimore several times; when I got back to the Steen place in the evening I saw Mr. Steen, his wife, and another man; I afterwards saw Leonard Larimore; he came into the main room of the Steen building; I was talking to Mr. Steen when Larimore came in; Larimore lived about fifty yards from Steen's place; Steen went out of the room, and Larimore and I was standing in the door that goes from the main room into the south room; we talked about two minutes when my attention was attracted to Mr. Steen saying, in a pretty loud voice, 'Get out Brownie'; I think that was what they called Leonard Larimore; when Steen said, 'Get out Brownie,' I turned but could not see him, and about that time there was a shot fired; it was from the northeast of where I was standing; I was then within about two or three feet from Larimore; something struck me in the finger and over the eye; I suppose it was shot; it may have been splinters; it knocked the hide off; when the shot was fired, Larimore fell; I left the room before Larimore got through falling; I went out through a window; after I got out I heard other shots; I could not tell any difference in the shots; all I know it was gunshots; after I heard the other shots, I went back into the house; Mr. Steen was standing in front of the door that went into the south room where I had been standing; he had a shotgun in his hand; Mr. Steen said he had shot Brownie; I said, 'What did you do it for?' and he said, 'Because he was trying to shoot me, didn't you see him?'; and I said 'No, I did not see anything'; I did not see any weapon in Larimore's hands when Mr. Steen told him to get out."

Other testimony on behalf of the state tended to show that there was some feeling between the defendant and the

deceased, the outgrowth of the deceased's attention to the defendant's wife.

The shooting is admitted by the defendant. Defendant called as a witness in his behalf W. J. Scribner, who testified, in substance:

"I am 42 years old; I live at Bow Legs, Okla.; I know Charles Steen and was acquainted with Leonard Larimore during his lifetime; I was at Charles Steen's home on the 15th of April, 1929, when there was a difficulty between Charles Steen and Leonard Larimore; it occurred some time around 8 o'clock; I had been doing some carpenter work for Mr. Steen that afternoon and went with him over to the house; a Mr. Heath came while I was there; I was there when the deceased, Larimore, came in; the first thing I heard Larimore say was something about 'What the hell are you doing here?' I suppose this remark was addressed to Mr. Steen; they then talked a little while, but I paid no attention to what was said; then Mr. Steen said to Larimore, 'Get out quick'; Steen told him that twice; at that time Larimore was standing with one hand in his pocket facing the west in the middle room; after Charles Steen told him the second time to get out he pulled a gun; Steen did not fire until after the deceased pulled his gun out of his pocket; when deceased pulled his gun out of his pocket, Steen grabbed his shotgun and fired; Larimore fell and dropped his gun; at the time Larimore started to pull his gun he was going toward the door of the room Steen was in; after Steen fired and Larimore fell, he came back into the little room and asked me to call the law and the ambulance; I asked him which one to get and where to go, and I heard a noise in the other room and walked to the door, and Larimore or Brownie had raised up on his hunkers and was scooting toward the door, and had a pistol in both hands; I jumped back and Charles Steen asked what was the matter, and I said, 'Look out, he is going to kill you yet'; about that time the deceased shot; after Larimore fired the shot, Mr. Steen fired the second shot; deceased fell

over and dropped his gun; I called the law and the ambulance; the defendant did not do anything to the deceased after he fired the second shot; if the defendant went up to the door where the deceased was I did not see him."

The defendant testified in his own behalf, and, in substance, gave the same evidence as did the witness Bill Scribner, and further stated the deceased lived about 50 to 100 yards from his place—

"I had been to my father's and when I returned Leonard Larimore was at my place; when I came in he asked me what the hell I was doing there, and I told him it was my place and I thought I had a right to be there; I went back to the northeast room where my shotgun was leaning against a trunk, possibly ten feet from the door that leads from the northeast room to the main part of the cafe; Bill Scribner told me to watch out for Larimore; I then told Larimore to get out; when I told him to get out he turned toward me and started pulling his gun; I saw his gun before I fired. My gun was a twelve-gauge shotgun, and loaded with No. 4 shot; Larimore fell when I fired the first shot; after I fired I sat down on the bed; there was only a minute until a shot was fired from his pistol; he was in the other room; I then fired at him again; when he fired he had his gun in both hands, on his hunkers; when I saw him with his gun in both hands, I was afraid of getting killed and I fired."

This is, in substance, the testimony of the witnesses who saw the difficulty  There seems to have been a feeling between the defendant and the deceased as shown by the testimony; a day or two before the trouble the deceased drove up to the filling station, accompanied by the wife of the defendant, and in a conversation with the man in charge of the filling station stated he had the defendant's wife and would have his business soon if he had to kill him.

Several errors have been assigned by the defendant as grounds for reversal of this case. In his brief the defendant has argued three propositions which he insists are sufficient to reverse his case; the first being,

"The verdict of the jury and judgment of the court is not supported by the evidence; second, misconduct of the county attorney; and, third, misconduct of the court."

This court will consider the questions argued by the defendant in the order they are presented in the brief. First, that the verdict of the jury and judgment of the court is not supported by the evidence.

Section 1754, C. O. S. 1921, in part, is as follows:

"Homicide is also justifiable when committed by any person in either of the following cases: First. When resisting any attempt to murder such person, or to commit any felony upon him, or upon or in any dwelling house in which such person is."

It is urged by the defendant that the killing occurred at the defendant's home. This is true. The record discloses that, where the killing occurred was not only the home of the defendant but also the place where he conducted his business. All the parties agree that the defendant was in his home at the time the trouble occurred; that the defendant and his wife were running a place of business in connection with the home. It is not disputed that the deceased and the defendant had a difficulty there; that deceased used a pistol and the defendant used a shotgun. It is further undisputed that the defendant told the deceased to get out of his house, and that the deceased did not leave, but drew a pistol from his clothing, and defendant shot the deceased and deceased fell; that the defendant was talking with the witness Scribner about calling an ambulance and the officers when a noise was

heard and Scribner advised the defendant to look out; that the deceased had a gun, holding it with both hands, and defendant again shot the deceased.

The question to be decided is, Was the action of the defendant in firing the shots justified? If so, the defendant should have been acquitted. There are no objections urged by the defendant to the general instructions of the court. The defendant urges that the testimony in this case is insufficient to sustain a conviction. The sufficiency of the evidence is a question for the jury under the proper instructions of the court. The jury are the exclusive judges of the weight of the evidence and the credibility of the witnesses, and, where there is any competent evidence to sustain the verdict and judgment, a conviction will not be reversed although the evidence may be conflicting or different inferences may be drawn from it. The weight and value of the evidence is for the jury, and its verdict will not be disturbed for insufficiency of the evidence. Adeaholt v. State, 19 Okla. Cr. 122, 198 Pac. 351; Gray v. State, 18 Okla. Cr. 411, 195 Pac. 503; Luther v. State, 18 Okla. Cr. 664, 197 Pac. 533; Richards v. State, 22 Okla. Cr. 329, 211 Pac. 515; Choate v. State, 37 Okla. Cr. 314, 258 Pac. 360; Mayse v. State, 38 Okla. Cr. 144, 259 Pac. 277.

The defendant next urges the misconduct of the county attorney in cross-examining the witnesses was such as to prejudice the jury against the defendant and work a miscarriage of justice. An examination of the record shows that the objections to many of the questions propounded to the defendant's witnesses by the county attorney were sustained by the court. The defendant urges that, although the court sustained the objections, the court failed to admonish the county attorney or reprimand

him, and permitted him to propound questions relating to improper and prejudicial matters before the jury, and forcing the defendant to object. The county attorney in his cross-examination of the witnesses for the defendant asked many questions that were improper, and the court sustained the objections of the defendant to the same. While the questions propounded by the county attorney were improper, we do not think they possess sufficient merit to warrant a reversal of this case.

The third and last proposition argued by the defendant is the misconduct of the court. In his argument he says the conduct of the court was such as would lead the jury to believe that the court was very desirous of a conviction. With this contention we cannot agree. While it is true the record discloses that the court asked many questions, we do not think the action of the court in the trial of this case prejudiced the rights of the defendant. The punishment imposed by the jury clearly shows that the jury, while it found the defendant guilty, believed the minimum punishment was sufficient. The defendant was accorded a fair and impartial trial. There are no errors in the record sufficient to warrant a reversal. The evidence is sufficient to sustain the judgment.

The judgment is affirmed.

EDWARDS and CHAPPELL, JJ., concur.